May I please report? My name is Dr. Larry Winkler, Counsel for Mr. Zunguza. This case possesses two major qualifications for review. One, that it is an early determination of an immigration pledge and two, that it is a violation. The IA's decision to deny Mr. Zunguza's application reflected an innate credibility. I had a question about that credibility determination. Was that issue preserved for him? Yes, Your Honor. Could you tell me where it was raised for the first time? It was raised before the board in an albeit an extremely short brief. Mr. Zunguza's prior counsel does assert in very general terms that the decision was not supported by the record. It was presented in a way that the board would know that this issue is in fact an issue that it should address completely. It would be an issue that would serve to overturn the IA's decision? Yes, Your Honor. And the reason for that is that it was addressed on the merits by the board. The lack of preservation was never raised by DHS before the board. And the board addressed the negative credibility determination on its merits. And therefore, that issue would remain preserved before this court. The negative credibility determination was raised in the petitioner's brief, page 5657, before this court and again in more than five regions. And therefore, the negative credibility determination would remain a live issue before this court. But your point was that it was a flawed determination? Yes, Your Honor. There were several reasons why the negative credibility determination is deeply flawed. It is in return to the due process issue. First, the IA mischaracterizes omissions as inconsistencies. You said on pages 56 to 57 of the blue brief? Yes, Your Honor. Specifically, the co-counsel raises the fact that the IJ's labeling of Mr. Zambouza's testimony inconsistent and at variance with information on his asylum application. What line are you referring to? It's about the second page, the first full paragraph of the page. The name of the second sentence, citing the record at page AR-301. However, her labeling of his testimony is inconsistent and at variance with information on his asylum application. Is this one of the points on your appellate brief? Yes, Your Honor. Which point? Where? It's not a point A specifically, but B. So it's lost in the middle of the paragraph and you're saying that's preserved for appeal? Yes, Your Honor. I respectfully assert that it's preserved for appeal. Admittedly, the blue brief did not provide it as a separate subject, but it is raised in the brief and given that it's in your point. It really should be like a neon sign that says, this is what I am appealing to this court. This is the basis for this court to overturn the BIA's determination. Don't you agree with that? I agree. Because what a point does, it tells the court, this is what I'm going to argue. I definitely agree that would be substantially more useful and beneficial to the court. However, I wouldn't agree that the failure to include the fact that the brief had a specific point in it would deem that issue more useful to the court, particularly as it is so intertwined with a due process challenge that was raised in the point A. I will tell you frankly, I'm not convinced. I understand, Your Honor, that that is a concern of the court. But given the fact that it is intertwined with the due process challenge, the negative credibility... Well, credibility is not intertwined with due process. You haven't identified in what ways there's information or documentation or aspects of the claim that could not be developed due to lack of time. In terms of credibility, I don't find the ability of the petitioner to talk in a manner with consistency with his prior statements. I don't find an issue which is covered by the due process claim of lack of time to prepare. If I could explain, Your Honor, the negative credibility determination was predicated on omissions from his written asylum application. The due process claim, in large degree, is the fact that he was not given sufficient time to prepare that asylum application. He was given one week to prepare that asylum application to put it down in writing. The immigration judge predicated her decision almost entirely on the fact that he then provided details in his testimony that were not contained in that written asylum application. So the due process claim, which is a lack of the opportunity for sufficient time to present his claim in writing, led to the negative credibility determination. And that's why those issues are so inextricably linked. Had he been given sufficient time, we would not have had this problem of the negative credibility determination. Because I would note that the immigration judge does not actually cite any specific inconsistencies internally within his testimony or between his testimony at all. It's part of the problem of his failure to corroborate any of the testimony that he presents. And that is his responsibility. In other words, to an outsider, his story is absolutely fantastical. It is amazing that all of these things could happen to this one person. That he could be targeted by the mafia in Parma, Italy. That he could then go to Milan, be targeted there also. That he could then go to Bologna, be targeted there also. That he could go to Treviso, be targeted there also. It's fantastic. I mean, all of this would seem to cry out for some cooperation. Hospital stays, police reports, anything. That certainly would be a valid point had it been properly asserted by the immigration judge in the Board of Immigration Appeals. The Adolai three-part test, which this court enunciated, and most recently in Donovan, is that this court requires strict adherence to the Adolai three-part test when your immigration judge is requiring corroboration. That is to identify the fact that it requires corroboration. Make a determination of whether or not it has to be corroborated. And if there's determination that there was not corroboration, then consider any explanations for the failure to corroborate. There is none of that, Your Honor, done by the immigration judge. There was no identifying of the specific pieces, the specific facts that required corroboration. Isn't that his responsibility, though? He weaves a story that is just incredible, actually. If you just look at it on its face, it doesn't mean it's not necessarily true, that it can't be proven. But that's his burden, isn't it? Statutorily, it's actually not his burden, although an immigration judge can require above and beyond what is required in the statute. In fact, the statute specifically indicates that an asylum applicant can carry his burden without corroboration. It was his attorney at the hearing that said, We need more time. We need more time. We need more time to do what? To get to the verifying information. Isn't that so? Yes, Your Honor. And he didn't do that. That is correct. He didn't specify at all that we need more time. Well, he did specify that he was trying to get medical documentation, but at the end of the day, the immigration judge, excuse me, Your Honor, the immigration judge did not apply the Delia standard. The immigration judge did not say, These are the facts that require corroboration. The immigration judge did not identify any specific evidence that was not provided, that shouldn't have been provided as the basis for denying the application. The immigration judge denied the claim as affirmed by the immigration judge. Do you feel that the immigration judge has to tell him what information he needs in order to corroborate the many instances involved in his testimony, or the episodes that he has? As it was stated by Delia, yes, but as a requirement, because the statute says that corroboration is not a requirement. It can be, but that is why we have these three parts, the test which this court indicates requires. I don't disagree with you that you don't have to corroborate everything that it testifies to, but my goodness, you need to have helped him a little bit. If his lawyer says I need more time to provide the information to corroborate. And his lawyer has denied that time. You weren't the lawyer. No, I was not the lawyer. Well, the lawyer never published a 13-page affidavit. That's correct, Your Honor. Which, as far as I can tell, it was new information from the courts now, but it wasn't the kind of objective evidence that one would have expected. Is there any objective in there, any records, anything of the sort that my colleagues have indicated would be helpful to your client? There were expert affidavits provided, and he's not getting what we expect. Professors in the United States who don't know what happened here will tell you. Right, but we, whether or not. There's no objective that happened to your client in the room. No, Your Honor. So when he says, I need more time because I need to get documents from Hillary, you have a case if the documents show up for Hillary later, and then we can read the documents and say, if we'd only been given a continuous re-requested, here's what we would have presented to the IJ. But that never happened, right? That's correct, Your Honor. And that may go to the sustainability of the subsequent decisions relating to the Board of Immigration, just on the motions we're dealing with. But we can't allow the provision or lack thereof of corroborating materials to somehow buttress the underlying immigration judge's decision. We have to look at the underlying judge's immigration decision as it was. It goes to one of the scenarios. I mean, even if you make an exception that there was error in moving forward, then we're going to have to look at whether it would have made a difference had the IJ granted the continuance. And the record here indicates that it may have made no difference because your client had a month later, increased error, and then much later, the motion to reopen almost produced a similar, more under self-serving testimony, Your Honor, than anything in the objective mentioned. Your Honor, it certainly would not be harmless error because the standards on motions to reopen are substantially different than when the case is pending before the court, before the immigration judge. Had the information been identified and he'd been provided the opportunity to get it, it may have been presented. We do not know whether or not it was a strategic decision to present the evidence on a subsequent motion to reopen. We do know that there are different standards, such as the requirement to change contract conditions after 90 days in order to present, you know, previously on a bail of 11. Let me see if I can get this right based on Judge Harding's question. I thought your argument was that there was an abuse of discretion to deny the request for continuances, that it was denial of due process as well because the IJ did not give Mr. Zaluza a fair opportunity to present his case. Yes, Your Honor. Is that right? That is correct, Your Honor. But all of those claims are premised on being able to get additional information to present to the court, aren't they? That is correct, Your Honor. But now you're saying, but that's not necessary. No, what I'm saying, Your Honor, is that a motion to reopen submitted once there's a final order removal requires the evidence to demonstrate a change in contract conditions. That's a separate claim. Medical evidence would not be presented as part of a motion to reopen because it wouldn't demonstrate a change in contract conditions. Contract conditions is a totally separate claim. I'm talking about the request for asylum and his fear of persecution if he goes to Italy. The first motion to reopen alleges a due process violation. Yes, Your Honor. The second one is the one that's concerned with the change in contract conditions. So the first one says, reopen my case, I need a due process. And the reason I need a due process is because I didn't have time to gather my evidence. That's correct, Your Honor. And here's my evidence. Where's the evidence? There's no evidence. What I'm asserting, Your Honor, is the fact that we can't presume, based on the fact that it wasn't presented as part of the motion to reopen, that it doesn't exist or it wasn't obtained because the motion to reopen still would require a showing of change in contract conditions. And this court, and this is precisely why the civilized standard, the response shouldn't have been provided, the opportunity while proceedings were open to present this evidence. And given that this court does require strict adherence to the civilized standard and there was no application of it, the ban would not be futile and Mr. Zuniga shouldn't be afforded the opportunity to present this evidence. It's an interesting case. I've not heard too many cases where somebody is granted asylum because he or she might be persecuted in Italy. Have you heard of such cases? From my research, the last case was in 2004. There was one case. The Department of Justice does publish statistics on where countries where individuals were granted asylum. To do that, we have to say that law enforcement officials in Italy are incapable of enforcing their own laws. Or unwilling to enforce their own laws. This court would not need to say that. That would need to be demonstrated before the Immigration Court. That would have to be shown in a subsequent proceeding. Yes, sir. I see I'm out of time. Are you pro bono, Mr. Zuniga? Yes, I am. Thank you, Mr. Zuniga. Go get your packet of rubato. Is it Mr. Shea? Mr. Shea. Okay. I've got an announcement to make. I also want to address three of the judge's concerns right from the start. First, the adverse credibility issue was not preserved in the petitioner's brief. If you turn to page 3 of the brief, there are two issues presented. It's very clear. Was it the denial of presumptive due process violation? And was there more abuse of discretion in the denial of history opening? Judge Roth is correct in saying that this one sentence on page 56 contesting the IJ's findings is not sufficient. In fact, if you actually look at the sentence before, the petitioner argues that the IJ understandably found the judge's evidence of testimony unpersuasive insofar as incomplete in that detail. So what does that do, Mr. Shea, in order to agree with you that this issue is not preserved? If this issue is not preserved, that means the only issue before the court is whether the continuance, whether the continuance was an abuse of discretion. So that becomes a non-arguable issue. It matters on a couple of grounds. One, insofar as the most of the evidence is concerned, the petitioner needs to show not only that he has a fear of persecution in Italy now, but that the circumstances in Italy are so bad that any immigrant can get in without any personal facts. So the circumstances in Italy have to be so bad that any immigrant has a reasonable fear of persecution. But he says they're pretty bad. He got beat up quite a bit, I remember, by a forklift. Right, but those facts are not established. The IJ never contested Abbott's credibility in China, so none of his individual claims are properly before this court. So the sole issue before the court is whether or not the continuance was an abuse of discretion. The IJ didn't say that everything we testified to was incredible. No, so long as we assume everything we testified to is incredible, that's not a record, is it? No, but if the IJ remembers an adverse credibility determination, we don't know what is credible. So, well, but didn't the IJ say what was incredible? For example, there were gaps in the testimony, there were these material issues, right? Correct. So those are the things that he understands but doesn't use. Everything we testified to was false? No, not at all. So the fact that he's an immigrant, the fact that he's on a broken beak, the fact that he had trouble with the large URA, that there was a workplace, a hospital workplace. Correct. All of these are relevant to his final claim, whether he was beaten, whether he was run over by a forklift, whether or not he was rallying the workers in the factory in order to protect the Russians. Those things are not established. Those things are significant facts that are relevant to his final claim. The IJ found that those things were not credible. Could you explain something to me? Because this case appears to be on a fast track, really streamlined, super streamlined, fast track, and it seemed like the immigration judge was, I mean, looking at the record, in a hurry to get this thing finished. Because he lands in Newark on March 30th, on June 18th, there's a merits hearing already, a final decision where he can get sent back to whatever country he's from, in this case Italy. That's like ten weeks to prepare a case, to get verifying information, to corroborate certain things, to get a lawyer, to talk to a lawyer. There are due process implications here because under the regulations, an immigrant or non-citizen should have an opportunity, fair opportunity, to present a case. How does ten weeks do it? Somebody who is not in this country doesn't have yet a lawyer. Your Honor, the case was streamlined pretty quickly. I think in part it was because he was a VWP applicant. He tried to come into VWP and he told them he was obviously applying to study English, and then he said he was going to work for his friend. And then after those two things failed, they gave him admission, he was cleared that he was afraid to return to Italy because he feared persecution. Your Honor, I was going to ask you, are people with visa waivers targeted for streamlined proceedings? No, but he was not admitted and he was also detained. And so I think for those of you who didn't understand, I don't know why exactly, but I know that visa waivers are typically partly taxed. Is there a State Department regulation that these cases must be started and concluded within a specified period of time? I don't listen, Your Honor. It seems to me you're understanding that when people have been admitted to the border and they're taken into custody, that those cases get higher priority, presumably because of the cost and expense of housing the incarcerated. There's a lot of other cases that could be detained. But that's just your sense of the practicalities of the situation. When you talk about an imposter, the case does things probably faster than usual, although it wouldn't be so bad that it would be completely unusual that these cases occurred. But when you go out, we've said that we have to give discretion. We have to defer to the trial judge for these cases. We have to run the docket for those cases. That seems obvious. But we've also said that due to request for more time, we need to address on a case-by-case basis Correct. What's the evidence here that this IJ made an individualized determination in denying the additional request for continuances? There were several continuances granted, but they were short. Correct. They were each a week. And I think the fifth one was denied. What's the evidence that there was an individualized determination in denying that request? I can recount one of the continuances being granted to obtain an attorney or the IJ's individual. So the IJ looked at it and said, you've had four chances to get an attorney, and now I'm going to give you another eight days to prepare. But you know, attorneys have to be paid for their reasonable services, and I think that there was a problem that with the attorney getting paid, his suitcase was in custom, so he didn't have access to any funds or resources to hire a lawyer. Wasn't that part of the problem? That may have been, Your Honor, I think. May have been? I thought that's what he said on the record. Well, that was a problem. I'm not saying that was a problem for why he would end up with a full-court case. Judge Hartman was asking about an individualized record, and I think that's one of the reasons why you present to the court that I need a little bit more time because I don't have my suitcase with me. I've been locked up, and the suitcase is somewhere else. You've probably got a lawyer to get the suitcase from. Right, Your Honor. But the I.J. said, okay, I'll give you another one week or something like that. Eight days, right. And then finally the lawyer comes in, and the I.J. says, no more. Your Honor, the time was long enough that he obtained an attorney in 81 days. That was the attorney's first appearance for the I.J., and the I.J. said, too bad. I know that the time for this case was short, but the standard of review in this case is abuse of discretion. So the question is whether or not it was so unreasonable that it was per se impermissible. And the government's position is not only that it is not a per se abuse of discretion, but also, as Your Honor has noted, it would not help this case. Okay, so he faces this statement of due process violation. But, you know, the corroboration, for example, of his somewhat incredible claims, when they were coming, even at the end of his merits hearing, his attorney stated that the medical records had been ordered. This is on page 359 of the record. The medical records had been ordered, and they're coming. Then he had a month to get those records, to submit them. They never came. Then he had another several months to file his first motion, and those records never came again. And then he had 13 months to file his second motion, and those records never came again. So if the records came in, then he's got a problem. That could be. So the government can say that a case like this should be remanded, when it's five or six weeks or 10 weeks to trial, and the lawyer says, I believe in the documents, when the documents came from a foreign country 60 years later, then those cases should automatically be remanded, should they not? Let me get to the court from the start, if you don't mind, because I think the rule right now is individualized determination. So I don't know if it would be five weeks, six weeks. But certainly there could be a situation where the time is so short and the claims that they can't corroborate actually do pan out, where the court decides that there needs to be a discussion. Do you have any case support for the notion of harmless error or immateriality in light of the facts here that these documents never arrived months or even years later? Well, certainly on the due process grounds. I mean, for any constitutional due process grounds, it succeeds. You have to show prejudice. What case do you say for that? I actually write somewhere substantial prejudice, and that's just prejudice for due process violations. Okay. More than the attorney general's in my brief. What page? Page 21 of my brief. Okay. The due process violation found in the A1C subject to a population of evidence obtained that could have impacted the outcome of the case. So it's more federal, I think, in constitutional violations that you have to show prejudice, and you clearly can't do that here. And this is also kind of what the IJ narrowly required them to corroborate. I don't think the first attorney understood that. I don't think the second attorney understood that. I think they both understood that one of the problems that IJ has is he can't corroborate his claim. So if you read the page in his direct appeal to the board, he says, I couldn't corroborate my claim, and that's why the IJ found him to be. And in his open brief, he also says on page 4, I can find that for you. But basically, he does say in his open brief that if I had more time, I would have been corroborating the medical records and police reports and the affidavits from other warehouse workers, and I wouldn't have given him time. But he was given quite a bit of time, and he still wasn't able to produce those pieces of evidence for the court. And the medical evidence were ordered? The attorney claimed they were. And they never came? And they never came. So in fact, in terms of the record, he says the records are on the way. They've been ordered and on the way. And still, 13 months later, we see nothing. Just one final point to raise for your honor. The plique comes under the Real ID Act, and as Judge Fuentes points out, the fantastical nature of the petitioner's claim does beg corroboration. In fact, the regulations provide the one of the factors the agency can rely upon is the inherent plausibility of the applicant's or the witness's account. And in this case, that clearly seems to be a question for both the viewer and IJ's decision-making. So, if there are no further questions, I'll open it up. No further questions. Mr. Barden. Thank you, Your Honor. I think it's important to focus on the basis for the denial by the immigration judge, the underlying claim. Well, but we've done that. The records never came, is that correct? The records were never submitted, Your Honor. Were they, Tom? I wasn't a counsel below. Did you inquire? I mean, certainly, when I was a practicing attorney, if I didn't have a chance to get something in, I would preserve it for the record by filing a copy with the court, or when I got it, filing a copy with the court saying, look, see, if you had permitted me to do it, this is what I would have provided. I inquired, but haven't received a response from the court of counsel, so I don't know. And the record doesn't reveal that information, and I don't think we can make any presumptions based on it, other than it was not submitted. But what is important is the records or lack thereof before the immigration judge was not what resulted in the outcome. And this is where, and I agree, a substantial prejudice is the standard. The substantial prejudice is the fact that the negative credibility of determination was the sole basis for the Board of Immigration Appeals affirming the decision of the immigration judge. Tell me something. If we were to determine, as Mr. Shea has argued, that this issue was right, is that pretty much the end of your case? No, Your Honor. I submit that... Do you have another light to stand on? Yes, we do. And there is the pattern of practice of persecution claim, which would remain, and that would not be predicated upon the negative credibility Pattern or practice? Pattern or practice of persecution of an African-American. That's your second? I see. Does that change country conditions? No, Your Honor. Pattern of practice is a standard that an individual can get a file on, even where their specific claim is found not credible. If there's a pattern or practice of persecuting members of a particular social group or pattern or practice of persecution on any objective... So you want us to conclude that in Italy there's a pattern or practice of persecution against Africans? Absolutely not, Your Honor. What I would want this court to do is afford the court below the opportunity to reach that conclusion. I don't believe that it is... Did you present sufficient evidence to allow the immigration judge to determine that there is such a pattern or practice in Italy? I would submit that that is... I'm saying you, but I don't know... I certainly understand your honest question. I believe that there would be sufficient evidence, particularly in light of the expert affidavits at this point, for that determination, at the very least, so that this court... But they are subsequent, aren't they? Yes, Your Honor, but I believe that this issue would be raising the question of whether or not remand would be futile in light of the negative credibility distribution being waived. But how is that issue preserved? Because it was raised as part of... It was raised before the immigration judge, although that issue was not addressed by the BIA in their underlying decision. Again, the BIA predicated their determination exclusively on the negative credibility determination. The negative credibility determination, the lack of continuance where the substantial prejudice comes, is that the negative credibility determination, continuing on pages 300 to 101, basically a paragraph by the immigration judge, was exclusively on omissions between his testimony and the asylum application. We'll see that all the time, then. Usually, we're trying to determine whether it goes to the heart of claim, but this wouldn't even have an issue here, do we? Could we have to do that, do you think? That's correct. Okay, so it doesn't even need to go to the heart of claim. But even in the cases where it does have to go to the heart of claim, usually what we're trying to ascertain is whether the information that is not conveyed before the petitioner layers up is the type of information that one would expect a persecuted individual to say. Right? So when the omissions... We're getting too fast often. We just say, oh, these are omissions, so don't worry about it. There are omissions of consequence, and there are omissions that are really sort of inconsequential that I.J. should not be putting any emphasis on. I'm certainly not trying to say that these are omissions, so we don't need to worry about them. What I'm saying is that it is directly relevant to the lack of preparation time that was supported. If we go back to the fact that he was given eight days to prepare his asylum application after being granted permission... If he's not only run out of room to do it, and he's been chased from city to city to try to explain to Italy, certainly what goes in there is the very first paragraph is, my client has been run out of Italy after having tried to relocate to four different locations or five different locations in Italy. There's no reason to expect that to be front and center of the application. That wasn't included in his original application, the fact that he moved from city to city. The fact that the police report, all that, anything that would have indicated independent corroboration, that stuff was not present in the initial application. It was testified to, and the promises were made that it was for recovery, and it never came. It was just that it was indicated in his asylum application that he was chased from city to city, that he was tied up, that he suffered an injury to his foot. The judge called it a profound mistake, that he broke his foot, but he specifically said that he suffered an injury to his foot. He indicated in a very, very short period of time that he had to prepare this extremely detailed claim. He prepared it with his lawyer, right? In a very brief period of time, yes. Many asylum petitions are prepared without a lawyer, and that's where we get more concerned about the discrepancies between the asylum petition and the testimony because the petitioner didn't have the help of a lawyer to prepare the petition, but here is the same lawyer who helped him prepare the petition and who then helped him prepare for trial, and so I think the inconsistencies are of more concern under those circumstances. Respectfully, Your Honor, I would just first assert that I don't believe that there were any inconsistencies. I really do believe there is a substantial difference between an omission of a detail that later emerges in the testimony and an inconsistency. But if you don't say that you sought police protection in Parma and you sought police protection in Iran, and then later you show up in Zestados, I mean, I'm not saying we would necessarily agree with the IJ, but isn't it within the purview of the IJ to say, well, I find that significant, and then I'm telling you, after you've been prepared to testify assuming that you sought police protection in these locations, but that's different, that's additional, and significantly additional to what you tell us when you fill out your application. If the immigration judge had correctly characterized the omissions of an omission and not an omission, and if the immigration judge had properly considered the totality of the circumstances, such as factoring in the time that was afforded, if the immigration judge had considered Mr. Zalouza's explanation for failure to include that information in his written asylum application, then I might agree with you, Your Honor. But the immigration judge acknowledged that, and all of those are requirements that are well established in this Court's precedent, but I'm noting in a very recent case, I'm sure I'm butchering the pronunciation, but of Duluth Shavelli, that case, which is a Real ID Act case, and it specifically addressed the fact that even where an asylum application is prepared with the assistance of a lawyer, facts that later emerge in testimony are not necessarily inconsistencies, but omissions, and cannot necessarily be used as a basis for negative credibility determination. Given that the Real ID Act explicitly requires consideration of the totality of the circumstances and a negative credibility determination in the one paragraph that was provided, there was no consideration of the totality of the circumstances. I respectfully assert that, at the very least, remand would be required for proper analysis, as required by the statute under the Real ID Act. Mr. Bardavid, you took this case pro bono, and it's greatly appreciated by the panel. Thank you very much. You'll have to consider a subspecialty in immigration law now. Thank you. Thank you. Mr. Shen, thank you very much. We'll take the case under advisement. Thank you. Go on. Call the next case. Clyde Shen v. The Turnzone. Mr. Bardavid knows how to draw a crown. Thank you. Okay. Well, very good. Shen v. The Turnzone. Mr. Holinsky? We have to address, of course, the preliminary matter, Mr. Holinsky, because this case has come to us in a very perplexing way. No. I understand that. I was asked to enter into it in a very perplexing way. Okay. Maybe we can give us some background, because just for the record, this case started out as a request, I mean, from our perspective, as a request that this court not list the case for argument. That was a request made by the Petitioner's Council. And then the next thing we know is that they're listed the case because the panel wanted to hear arguments in the case. Shortly after that, we learned that a motion is filed by Mr. Shen's council to withdraw the appeal. And that started, I guess, a chain of events that has got us shaking our heads. And so after that, we learned, well, maybe that's not so, because you're stepping into the case. Can you give us the background and explain what's going on? Let me do it. May I introduce the court? My name is Jessica Holinsky. I'm the Petitioner for Mr. Cheng. I'm respectfully reserving five minutes, if I may, to answer the court's question. I entered into representation in this matter at the request of colleagues at the National State Center. At the request of my colleagues at the Nationality Service Center. I used to work there, and I worked with the folks who had been working on this case. And when the court's order came through that it wanted to hear an argument, they asked me to step in. The client person has requested the withdrawal of the petition. The reasons why is his perspective, and I'll tell you as an officer of the court, I'm not comfortable with it. But as an advocate for my client, we have to honor his request. I feel his request is... Did you talk to him personally? Did you talk to him personally? I went to be with him with Caitlin Barry, who is one of the attorneys at Nationality Service Center. Just last week. And his request was to withdraw the petition after the government denied a release, a parole request that he did release in custody. That's what concerned me, that he's been in custody the whole time. Correct. And he is so distraught about being in custody that he has conceived his own way of getting out of custody is to simply give up and be deported. That's his perception. There are a couple of other alternatives. I'm going to discuss them with my colleagues. Potential habeas, re-pursuing and asking for reconsideration by ICE for parole denial. ICE cited a section for mandatory detention that I don't believe applies to 36C, which normally applies to pre-primary detention situations. How long has he been in detention? How long has he been in detention? How long is... How long has he been in detention? He was placed in criminal custody in the beginning of 2010. He's been in immigration custody since the beginning of March of 2011. So just over 17 months. 16 months. It's not as normal as other clients have had, but different clients have had it like this. This is a gentleman who didn't spend a day in jail. Before this offense, most of you have done was a DUI. So custody and detention... What would withdrawal of the appeal have accomplished for an immediate release? What would withdrawal of the appeal accomplish for it? Immediate deportation? To Cambodia? The possession is in the Cambodian community. No. And that is something that actually is reasonably true, but not really. About two years ago, there was some fairly highly publicized deportations to Cambodia. It's a country that doesn't accept many people, but will accept certain people. And the mechanisms for doing so are very convoluted. And I don't even understand them. But I do know that there was a group of about seven individuals. I represented one of them two years ago, who were eventually deported from the U.S., which was a very significant change. Coming in refugee status, adjusted status to come to residence. They never got their citizenship in any way. And they committed crimes. And most of them were for aggravated crimes. And so they were all deported. But part of the problem here is in the criminal system, and I know in this community in particular, the ideas that permeate through the Cambodian community are that even if you have these criminal offenses, it's still in the Cuban community. And where people have a perception, my country is never going to take me back. And no matter what, and that there's mechanisms to get yourself out of the detention situation with parole requests and whatnot, after accepting the final deportation. And so that's his perspective. So that raises an interesting thing. I'm not going to go through you. Right? Yeah. Which is, you know, it sounds like his perception is wrong, or potentially wrong. Potentially. If you're playing odds, you tell me how to bet against him you're correct. You give him that odds, and I'm not betting against him, but the odds for him being able to stay are probably close to 60% to 70%. Oh, that's good. That's a general rule. Yeah. It would make me a 50-50 shot. So, but still. Stay where? Stay in the United States. Even if there are hundreds of people, what allows them to stay? The ability of the Cambodian government, or the unwillingness of the Cambodian government. It's just a large number of people. Yeah. So, the countries that we are all reaching for here, not every country, but certain countries, and the countries in the Southeastern Conflict, Vietnam and Cambodia, are prime examples. Cuba is another, where there's very specific agreements with those countries. Yes. Or, it's essentially. The receiving things are at diplomatic level, not simply at people. If I ask a paroling counselor, I was going to ask you, because it's more superb, but when you're in a situation where the client is asking to have his wishes discharged, and we should. He'll get out on parole if. And take his charges. If he may. How long will it take him to get out on parole? Well, if he just had a parole request denied, and in part he was denied, because of the government, I believe, and correct perception, that this matter is not yet a final order. Like I said, they cited a section of the statute that deals with mandatory detention pre-final order, which is 236. After a final order, and technically, under the statute, the order becomes final for the government, with the administrative order from the board, not any order from this court. So, one, but they may have been perceiving that the stay granted by this court still imposed that 236 mandatory detention. So I think I can, in good faith, both from a client's perspective, and as an officer of the court, request that the stay deportation be lifted, so that the agency can re-examine his custody situation under post-final order scenarios, which do not contain mandatory detention. So, we should just make this out of the judicial system and put it in the administrative system. He has asked us to do that. He has asked you to do that. And there's no reason not to. Well, he may agree, and they may use his strategy, and they may pay off for him, and they may not, and we don't know. No. No, we don't know. But we do know this is his wish. Yeah. I mean, as an officer of the court, I can tell you that, and I've reviewed the transcripts, I've reviewed the arguments, my concerns with this is that a, it's a fairly regular occurrence in our detained immigration docket system, and in related to, I think, earlier, one of the, what he did with the earlier argument about the speed at which we have to move, and I go to New York all the time, and I've appeared in front of both of the judges who are regulars there, and they both try to do their jobs in honest ways, but they feel pressures, immigration government attorneys feel pressures to get things out and to move them along, and I think, when I looked at the way that this case was handled, most especially with the interpretation, the thing that really stuck out for me was... No, no, I mean the merits of the case. Yeah, yeah, yeah. The question had to do with whether he thought this out completely, and what I'm saying to you, in the sense of having to make sure that you understand why we're saying yes, we're here, we're not going to counter that. As much as I would like to, like I said, as an officer of the courthouse, and someone who reviews these kinds of systemic issues all the time, and we have to look at them all the time, there are issues here that do merit consideration, and there are issues that do not. We can appeal to that. We can appeal to that. We call for argument. Right. But let's not make it what a contest there needs to be. Do you, standing there, do you see any reason why this court should not grant the petitioner's motion to withdraw the appeal? As is advocating now. Okay. You let me hear it, but not the courthouse. Excuse me, I think I asked you before, you did speak to him, and he considered all of these strategies that you have just told us about, and notwithstanding all of that, he wants to withdraw the appeal. You can speak to him, but somebody else. I'm sorry. The one thing that would be potential that would remain in terms of a legal right to stay, and not just this limbo land that people will find in orders that can't be removed, existent, if his criminal conviction is modified in any way and in fact it would relate to some of the issues that we've been talking about. How would that happen? How would that happen? Negotiation. Negotiation? With the criminals? He's already served the sentence. Hasn't the government said that we will not consider post-hope revisions to change our initial decision to refine removal? Well, no. If you get an actual change in your conviction, and again, is there a legal right to do anything if you're refining going through criminal disobedience? No. I don't believe there is because if you have to go through your house from when the sentence was done, there's a lot of different aspects to it. However, have a few stranger things happen in terms of modification in terms of already completed criminal cases and criminal sentences? No. So, in terms of whether you get out and it will be continued, will you pursue some efforts in that regard? Absolutely not. Your request is that the motion to withdraw the appeal be granted? The motion to withdraw is granted. Is that your request? Our request is an advocate for a criminal case. Thank you. I'm satisfied. You've looked at the issues over and down and that's... I appreciate that because I think when I speak to my colleagues, I know I have a concern that perhaps this fellow has not been represented in a way that was serving his best interest. Could you really alleviate my concern? Yeah, go ahead. I call it to national uncertainty. Like I said, I worked there for five years and worked in different capacities with both Caitlin Barry and the sheriff. They definitely work on this and they're hard for this client. As I said, there's a difference sometimes when we as attorneys perceive the legal rights of our clients differently than their practical rights. And sometimes people have to give up substantive rights whether or not we're comfortable with it. And I'll tell you I'm not comfortable with it. I think there are serious issues within this case and I hope that in other contexts and other places the court will eventually be able to review. Mr. Halsey, thank you very much. You're welcome. Ms. Smith, is your work done or do you want to at least make an appearance? Well, it's good to know the government is on the record. My name is Gary Smith and I represent the Attorney General. I have to ask you, this is first for me, but the folks who are deemed to have committed aggravated felonies get the state of the country. Do you want to address that? Yeah, I'm here exactly to get the DHS to review this case that the petition for review has dismissed. And I have spoken to the legal officers at DHS and they say there are no travel documents currently in place for him. And that in fact is their policy not to keep those travel documents with the embassy until the state of removal is lifted because there's essentially no point in trying to get travel documents from the state of removal in place. So that's the state that we put on there? Yes, Your Honor. So your request is to remove the state of removal? Let me follow up on Judge Harney's question. Practically speaking, what happens in a case like this? Is there removal is lifted? Is he therefore eligible for removal? Cambodia may not want him or he doesn't want him out of Cambodia. What happens then? Does he have to be tossed out somewhere? Or is there a point where removal is just not practical? Frankly, Your Honor, I'm not sure that's a matter that DHS deals with and we don't deal with those issues before the court. I know that sometimes people are removed for a long time and they don't have to be removed again. I don't know. My office doesn't deal with detention issues. That's also done through DHS. I don't know. I'm not sure whether that decision is correct or not and whether he will be able to be released pending any removal. It appears to be nothing further than we can do with the case. I guess we will agree that the state of removal will have to be lifted. Thank you both very much for at least enlightening us about what's going on in this case. Thank you. According to the third case on the calendar, O'Halloran v. Thomas Jefferson University Hospital. We have to put you in the hot seat. Good   Honors.      concern about the state of O'Halloran. The state of O'Halloran is a state that has a                                                                                        very well argued case. I take the case under advice. Thank you. Thank you. With the        you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  you. Thank you. Thank     you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank